IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BEATRICE WESTON | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | NO. 12-5111 |
| CITY OF PHILADELPHIA, et al. | : | |
| | : | |
| v. | : | |
| | : | |
| INTERCULTURAL FAMILY | : | |
| SERVICES, INC. | : | |

**MEMORANDUM**

**SURRICK, J.**                                    **JANUARY  5 , 2015**

Presently before the Court is the Motion for Summary Judgment (ECF No. 27) filed by Defendants, City of Philadelphia, Nefertiti Savoy, and Richard Ames, Esquire (collectively the "City Defendants").  For the following reasons, the City Defendants' Motion will be granted.

**I.      BACKGROUND**

This case presents a sordid tale of abuse of an innocent child at the hands of her aunt. Beatrice Weston was born on December 9, 1991.  She is the youngest of her mother Vicky Weston's five children.  While raising her children, Vicky Weston had extensive contact with the City of Philadelphia, Department of Human Service (DHS) as a result of her mental status and her "severe difficulty carrying out the role of parent."  (Pl.'s Resp. to Defs.' Mot. Exs. D – F, ECF No. 30.)  On July 19, 2002, the Court of Common Pleas of Philadelphia County, Pennsylvania, Family Division, held a truancy hearing with regard to Beatrice's older brother. (Undisputed Material Facts ¶ 2, ECF No. 27-2.)[1]  During the July 19, 2002 hearing, the court *sua*

_____

[1] The City Defendants filed a list of Undisputed Material Facts in support of their Motion

*sponte* ordered DHS to file a dependency petition on behalf of Beatrice.  (*Id.*)  DHS complied

with the court's order and thereafter initiated proceedings for Beatrice.  (*Id.* at ¶ 3.)  A hearing on

the DHS dependency petition was scheduled for August 16, 2002.  (*Id.* at ¶ 6.)  On August 7,

2002, prior to the hearing, DHS case worker Nefertiti Savoy visited Vicky Weston's home for

the purpose of confirming operational utilities and adequate resources.  (Pl.'s Resp. 2.)

Beatrice, her mother Vicky, maternal aunt Linda Weston, and maternal cousin Jean

McIntosh were all present at the August 16, 2002 hearing.  (Undisputed Material Facts ¶ 7.)

Also present at the hearing was Child Advocate Tara Wayt, Esquire, on behalf of Beatrice, city

solicitor Rick Ames, Esquire, on behalf of DHS, and DHS case worker Savoy.  (*Id.* at ¶ 10.)

Plaintiff contends that Savoy intended to recommend to the court that Beatrice remain at her

mother's home, with Services to Children in their Own Home (SCOH) to be provided.  After

talking to Vicky and Linda Weston, Savoy recommended to the court that Beatrice go to live

with her aunt, Linda Weston.  (Pl.'s Resp. 2-3.)  Relative to this recommendation,

representations were made to the court as follows:

> THE COURT:          …Where do I go from here?   Now, I know Beatrice is
> truant.  Now, she's out of that environment.
>
> DHS SOCIAL WORKER:    Well, Your Honor, mother had said that she would
> accept SCOH services, but today the aunt wants her to stay with her and go to
> Catholic school.
>
> THE COURT:          Now, do you guys live together?
>
> MS. McINTOSH:        We stick together.
>
> THE COURT:          You haven't left her side.

---

for Summary Judgment.  (ECF No. 27-2.)  Plaintiff filed a response, and either admitted or
denied with qualification each of the City Defendants' "undisputed" facts.  (ECF No. 30-3.)  This
Memorandum will cite only to those "undisputed" facts proffered by the City Defendants which
Plaintiff admitted without qualification.

MS. McINTOSH:      My mother has four children in the home.  She has a four bedroom house.  Their children go to Catholic school.  We would like to put Beatrice in the same school where she would have attention and there will be no problem with –

MS. WATE:          And Beatrice wants to stay with her aunt, right?

THE COURT:         Do you want to live with your aunt for a while?  You want to go to school with your cousins?  What do you think?

DHS SOCIAL WORKER:     Mother's in agreement, so.

. . .

THE COURT:         I'm just looking to the family for direction here.  I'm about Beatrice, I'm worried about Vicky.

. . .

THE COURT:         Did we check out Linda Weston's home?

DHS SOCIAL WORKER:     No.

MR. AMES:          Because of that I think our recommendation would be to adjudicate dependent, temporary legal custody to Ms. Weston, supervision, DHS, SCOH.

. . .

THE COURT:         This is what we'll do: I'm going to adjudge Beatrice dependent, I'm going to place temporary legal custody with Linda Weston.

. . .

THE COURT:         SCOH level two shall be implemented, DHS to arrange for appropriate behavior and health evaluation.  I'm going to bring this back.  And, DHS, I'm assuming will investigate the home?

. . .

THE COURT:         …Any other issues or concerns?  Who last saw the child?

DHS SOCIAL WORKER:     8/7, Your Honor.

THE COURT:         And the child was safe?

DHS SOCIAL WORKER:     Yes.

THE COURT:          I find safety and reasonable efforts at this point.[2]

(Aug. 16, 2002 Hr'g Tr. 7-12, Defs.' Mot. Ex. E.)  The record reflects that Vicky Weston did not

voice any objection to this proposed custody arrangement.  Notwithstanding Savoy's

representation to the court that no investigation of Linda Weston's home had occurred, the court

adjudged Beatrice dependent and placed her in the temporary legal custody of Linda Weston.

(*Id*. at 9-10.)  After ordering DHS to investigate Linda Weston's home, a follow-up hearing was

scheduled for October 15, 2002.  (*Id*. at 11-12.)  Beatrice was not committed to the custody of

DHS.  (Undisputed Material Facts ¶ 21.)

As part of the court ordered temporary legal custody arrangement, SCOH services were

to be provided at Linda Weston's home.  DHS contracted with Intercultural Family Services, Inc.

(IFS), a third-party vendor, to provide these services.  (*Id*. ¶ 25.)  On October 11, 2002, Savoy

and IFS supervisor, Migdalia Rodriguez, visited Linda Weston's home for an initial inspection.

(Pl.'s Resp. 4.)  Beatrice and Linda Weston were both present for the inspection.  (Undisputed

Material Facts ¶ 31.)  It was noted that the "home appears safe," and "all utilities are operable

[and] there is adequate sleeping arrangements."  (*Id*.)  IFS case worker Danielle Hibberd was

thereafter assigned to handle the SCOH services for Beatrice.  (*Id*. at ¶ 32.)  The October 11,

2002 visit was the only in-home visit by Savoy to Linda Weston's home.  (Pl.'s Resp. 4.)

During the months that followed, Danielle Hibberd had nineteen in-person visits with

Beatrice and Linda Weston, which included one visit with Beatrice at her school outside the

presence of Linda Weston.  (Undisputed Material Facts ¶¶ 50-51.)  These visits were held on

---

[2] The Rules governing dependency proceedings in Pennsylvania, promulgated in connection with the Pennsylvania Juvenile Act, 42 Pa. Cons. Stat. Ann. § 6301 *et seq*., require a court to make a finding that the county agency made reasonable efforts to prevent the removal of the child from the home.  Pa. R. Juv. P. 1514(A)(3).

regular intervals from October 2002 through April 2003.  (IFS Case Manager's Contact Notes, Pl.'s Resp. Ex. M.)  Notes taken at each visit reflect that Ms. Hibberd viewed Beatrice as being in a safe, stable environment and doing well with her aunt.  (*Id*.)  As of November 13, 2002, Ms. Hibberd notes that she intended to recommend to the court that the frequency of supervision be decreased.  On November 18, 2002, she noted that the court was aware of the intent to dismiss supervision in the near future.  (*Id*.)  On March 26, 2003, Ms. Hibberd noted that the case would be closing soon, and on April 2 and 9, 2003, Ms. Hibberd indicated that she would be recommending to the court that the supervision, and case, be closed.  (*Id*.)  According to Plaintiff, Ms. Hibberd was a novice case worker and Beatrice's case was one of the first SCOH cases she handled.  (Pl.'s Resp. 6.)

During the time of the IFS visitations to Linda Weston's home, the court retained jurisdiction over the matter.  Placement review hearings were held after the August 16, 2002 hearing.  A hearing was held on October 15, 2002, where Beatrice, Vicky, and Linda Weston appeared, along a DHS social worker,[3] and Child Advocate Thomas Purl, Esquire, on behalf of Beatrice.  (Pl.'s Resp. Ex. X.)  The court made a finding that Beatrice was safe, living with Linda Weston as of October 11, 2002, and ordered DHS supervision of Beatrice to continue.  (*Id*.)  The temporary legal custody arrangement remained in place.  (*Id*.)  A court hearing was held on November 18, 2002.  Vicky and Linda Weston were reported present, along with Child Advocate Mr. Purl, a DHS representative, the SCOH social worker, and a DHS social worker.[4]  (*Id*.)  At

---

[3] The court records from this hearing are silent as to the identity of the DHS Social Worker.  Plaintiff contends the DHS Social Worker present at this hearing was Savoy.  There is nothing in the record to suggest otherwise.

[4] Again, the court records are silent as to the identity of the SCOH social worker and the DHS social worker.  Plaintiff contends that these individuals were Ms. Hibberd and Savoy.  There is nothing in the record to suggest otherwise.

the November 18, 2002 hearing, the court made a finding that "[i]t is not contrary to the health, safety or welfare of [Beatrice] to continue in the home with [Linda Weston]," and further that DHS made reasonable efforts for Beatrice to remain in Vicky's home prior to her placement with Linda Weston.  (*Id.*)  The SCOH level of supervision was decreased, the temporary custody arrangement was to continue, and a hearing was scheduled for April 17, 2003.  (*Id.*)

A final dependency hearing was held on April 17, 2003.[5]  Present at the hearing was Linda Weston, a DHS representative, Child Advocate Ms. Wayt, on behalf of Beatrice, and Savoy.  (Undisputed Material Facts ¶ 64.)  The court made a finding that Beatrice was safe living with Linda Weston as of April 9, 2003.  (Pl.'s Resp. Ex. X.)  At the conclusion of the hearing, the court discharged DHS supervision over Beatrice's case, discharged the dependency petition, and ordered that the temporary legal custody arrangement with Linda Weston continue.  (*Id.*)  SCOH services through IFS were also discharged.  (*Id.*)

On December 1, 2003, after the court's discharge of Beatrice's dependency proceedings, a hearing was held with regard to Beatrice's brother.  (Pl.'s Resp. 9.)  The judge presiding over this hearing had supervised the majority of Beatrice's dependency proceedings.  (*Id.*)  Savoy and Child Advocate Ms. Wayt were present for the hearing.  (*Id.*)  During the course of the hearing, Vicky and her sister, Florence Weston, represented to the court that Linda Weston had previously been convicted of murder.  (*Id.*)  The file notations of Ms. Wayt reflect that the court directed DHS to investigate these claims and file a restraining order if Beatrice was not safe. (*Id.*)  Beatrice's mother, Vicky, knew of her sister's prior murder conviction when she appeared at the initial August 16, 2002 hearing, but said nothing.  (Undisputed Material Facts ¶ 9.)

_____

[5] A single judge supervised Beatrice's dependency proceedings from the time DHS was ordered to file a dependency petition on her behalf, through at least the November 18, 2002 hearing.  For reasons that are unclear, the April 17, 2003 hearing was held before a different judge.

Prior to, and during Beatrice's dependency proceedings, Savoy failed to investigate Linda Weston's background.  Specifically, Savoy failed to "obtain a ChildLine[6] clearance for [Linda] Weston and any other adult living in [Linda's] home to check for prior instances of child abuse or neglect, perform a criminal background check, complete a risk assessment, and investigate any prior involvement with DHS."  (Pl.'s Resp. 4.)  Completing such investigations, according to Plaintiff, would have revealed Linda Weston's murder conviction and a prior report of abuse within DHS's system.  (*Id.* at 5.)  Savoy also failed to conduct a ChildLine clearance and criminal background check of other adults living with Linda Weston, specifically her live-in boyfriend Gregory Thomas.  (*Id.*)  These checks would have revealed a prior conviction for child abuse.  (*Id.*)  Furthermore, Savoy failed to follow-up on the allegations made at the December 1, 2003 hearing regarding Linda Weston's troubled past and the court's directive to investigate Linda Weston.  (*Id.* at 9-10.)  Savoy failed to formally close out Beatrice's file in DHS, and a new case worker inherited the file in 2004.  According to Plaintiff's proffered records, DHS noted Beatrice to be safe as of November 30, 2004.  (Pl.'s Resp. Ex. JJ.)

The record contains no evidence that any individual involved in the dependency proceedings—the Child Advocate attorneys Ms. Wayt or Mr. Purl, IFS, or any other employee of DHS—performed an investigation into Linda Weston's past.  It was Savoy's affirmative belief that no criminal background and ChildLine check were required for Linda Weston, because of the temporary nature of the legal custody arrangement.  (*Id.* at 5.)  However, Savoy's supervisor, Zachary Margolies, testified that he expected that DHS case workers would be performing risk assessments, criminal background, and ChildLine checks on any individual with whom the court

---

[6] A ChildLine check is employed to research prior instances and reports of child abuse. (Pl.'s Resp. n.3.)

places a child.  (*Id.* at 19-21.)  Notwithstanding Mr. Margolies' expectations, the record contains no evidence that DHS policy—policies that comport with Pennsylvania state policies—require such an investigation when dealing with temporary legal custody arrangement.[7]

The record reflects that over the ensuing years, Beatrice was subjected to imprisonment and horrible abuse by Linda Weston and others.  Among other things, she was beaten, sexually assaulted, denied food, and denied schooling.  Linda Weston forced Beatrice to move from Philadelphia, PA to differing locations in Virginia, Texas, and Florida, before eventually returning to Philadelphia.  (Pl.'s Resp. Ex. AA.)  The record is not entirely clear as to when the abuse began, however it continued until October 2011 when Beatrice was finally rescued by police.

Plaintiff initiated this litigation against the City Defendants in the Court of Common Pleas of Philadelphia County, Pennsylvania on August 20, 2012.  (Defs.' Not. of Removal, ECF No. 1.)  The City Defendants removed Plaintiff's suit to this Court on September 7, 2012, asserting federal question jurisdiction under 28 U.S.C. § 1441.  (*Id.*)  The City Defendants filed a Third Party Complaint on May 17, 2013 (Defs.' Third Party Compl., ECF No. 13), joining Intercultural Family Services, Inc. (IFS) as a third party defendant in this litigation.  On September 26, 2014, after completion of discovery, the City Defendants filed the instant Motion. (Defs.' Mot., ECF No. 27.)  Plaintiff timely responded to the City Defendants' Motion (Pl.'s Resp., ECF No. 31), and the City Defendants thereafter filed a Reply Brief.  (Defs.' Reply Br., ECF No. 33).  IFS did not take a position on the City Defendants' Motion.

## II.    LEGAL STANDARD

A party is entitled to summary judgment "if the movant shows that there is no genuine

---

[7] We note that such a thorough investigation is required for a prospective foster parent, a custodial arrangement different from the temporary legal custody arrangement involved here.

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted.").  Where the nonmoving party bears the burden of proof at trial, the moving party may identify an absence of a genuine issue of material fact by showing the court that there is no evidence in the record supporting the nonmoving party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *UPMC Health Sys. v. Metro. Life Ins. Co.*, 391 F.3d 497, 502 (3d Cir. 2004).  If the moving party carries this initial burden, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial.  *See* Fed. R. Civ. P. 56(c) ("A party asserting that a fact is genuinely…disputed must support the assertion by…citing to particular parts of materials in the record."); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (noting that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts.").  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  *Matshshita*, 475 U.S. at 587 (citation omitted).  When deciding a motion for summary judgment, courts must view facts and inferences in the light most favorable to the nonmoving party.  *Anderson*, 477 U.S. at 255.  Courts must "not resolve factual disputes or make credibility determinations."  *Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1127 (3d Cir. 1995).

## III.    DISCUSSION

Plaintiff brings this Section 1983 claim under a state-created danger theory of liability.  Plaintiff's theory focuses on the inactions of Savoy, specifically the failure to properly

investigate the background and circumstances of Linda Weston and the effect on Beatrice.[8]
Plaintiff argues that the failures of Savoy constitute a deprivation of her substantive due process
rights guaranteed under the Fourteenth Amendment.

### A.     Plaintiff's State-Created Danger Theory of Liability

The state-created danger theory of liability finds its roots in the Supreme Court's decision
in *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189 (1989).  In
*DeShaney*, Joshua DeShaney was placed in the custody of his father following his parents'
divorce.  489 U.S. at 191.  Over a two-year period, county authorities were on notice of
suspected abuse of Joshua by his father, but no further action was taken aside from the state
temporarily taking custody of Joshua before recommending to the juvenile court that he be
returned to his father a few days later.  *Id*. at 192.  He was, in fact, returned to his father.  A case
worker, assigned to make regular visits to the home, noted injuries to Joshua and suspicions that
someone in the home was abusing Joshua, but did nothing more.  *Id*.  Eventually, Joshua was
beaten so severely by his father that he fell into a coma, resulting in mental incapacities for the
remainder of his life.  *Id*.

An action was brought pursuant to 42 U.S.C. § 1983 against the county and county
children and youth services agency.  *Id*.  The Court concluded that the county agency had no
duty to protect Joshua.  *Id*. at 201.  This conclusion was consistent with prior Court rulings,
which read the Due Process Clause to "confer no affirmative right to governmental aid, even
where such aid may be necessary to secure life, liberty, or property interests of which the
government itself may not deprive the individual."  *Id*. at 196 (collecting cases).  The Court

---

[8] In response to the City Defendants' Motion, Plaintiff agreed to dismiss all claims
against Rick Ames, Esquire.  Accordingly, all that remains is Plaintiff's state-created danger
claim based upon the inactions of Savoy, and a claim of municipal liability under *Monell v.
Department of Social Services of the City of New York*, 436 U.S. 658 (1978).

ultimately concluded that because the "State had no constitutional duty to protect Joshua against his father's violence," its failure to do so "simply does not constitute a violation of the Due Process Clause." *Id*. at 202.

Drawing on the *DeShaney* Court's language that "[w]hile the State may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them," *id*. at 201, several appeals courts developed the state-created danger theory of liability. The state-created danger theory was formally adopted by the Third Circuit in *Kneipp v. Tedder*, 95 F.3d 1199, 1201 (3d Cir. 1996). Under 42 U.S.C. § 1983, liability may attach where the state actors create or enhance a danger that deprives a plaintiff of her Fourteenth Amendment substantive due process rights. *Id*. at 1205. In the case of *Bright v. Westmoreland County*, 443 F.3d 276 (3d Cir. 2006), the court set forth four elements that must be established by a plaintiff proceeding under a state-created danger theory:

(1)     the harm ultimately caused was foreseeable and fairly direct;

(2)     a state actor acted with a degree of culpability that shocks the conscience;

(3)     a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and

(4)     a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.

*Id*. at 281.

The City Defendants contend that Plaintiff has failed to establish each of these elements. Because we find that the fourth element is dispositive, we need not address elements one, two, and three. The fourth element requires an affirmative act on the part of the state actor that

creates the danger.  *Id*. at 282 ("Liability under the state-created danger theory is predicated upon

the state's *affirmative acts* which work to the plaintiffs' detriments in terms of exposure to

danger.") (citations omitted) (emphasis original).  "It is misuse of state authority, rather than a

failure to use it, that can violate the Due Process Clause."  *Id*.  However, "the line between action

and inaction is not always easily drawn."  *Morrow v. Balaski*, 719 F.3d 160, 177 (3d Cir. 2013)

(en banc).  The test "is not intended to turn on the semantics of act and omission.  Instead, the

requirement serves an important purpose:  to distinguish cases where government officials might

have done more to protect a citizen from a risk of harm in contrast to cases where government

officials created or increased the risk itself."  *Id*. at 186 (Ambro, J., concurring in part and

dissenting in part).  "[T]he fourth element is satisfied where the state's action was the 'but for

cause' of the danger faced by the plaintiff."  *Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 432 (3d

Cir. 2006).  This affirmative act element is the most frequently litigated.

    The City Defendants contend that Plaintiff fails to establish the fourth element because

there is no evidence to show that Savoy acted affirmatively to render Plaintiff more vulnerable to

danger.  Plaintiff counters that Savoy affirmatively misused state authority in the following

ways:  (1) recommending Beatrice live with Linda Weston in the absence of prior information

regarding suitability as a custodian; (2) performing a "grossly superficial and inaccurate"

investigation into Linda Weston and her home; (3) deficient oversight of Beatrice's SCOH

services by IFS; (4) representing to the state court Beatrice was safe with Linda Weston during

the duration of the dependency proceedings; and (5) violating the state court's December 2003

order to investigate the claims that Linda Weston had a criminal history involving murder.  (Pl.'s

Resp. 15.)  Obviously, Plaintiff's contentions are troubling in light of the fact that Savoy is one

of the principle individuals ensuring Beatrice's well-being.  However, Plaintiff's contentions are

in reality an attempt to re-characterize Savoy's failures to act as affirmative acts.  *See Sanford v. Stiles*, 456 F.3d 298, 312 (3d Cir. 2006) (per curiam); *Morrow*, 719 F.3d at 178.   Clearly, Savoy should have performed a more thorough investigation into Linda Weston, particularly after the state court's directive to do so.  No doubt Savoy's failures constitute negligence.  However, establishing negligence is not sufficient, as negligence alone does not rise to the level of a deprivation of due process.  *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998) ("[L]iability for negligently inflicted harm is categorically beneath the threshold of constitutional due process.") (citation omitted); *DeShaney*, 489 U.S. at 202 ("[T]he Due Process Clause of the Fourteenth Amendment, which, as we have said many times, does not transform every tort committed by a state actor into a constitutional violation").  The record here fails to establish anything more than Savoy failing to have done more when the circumstances called for more.  Such failures do not rise to the level necessary to satisfy the fourth element of the state-created danger theory.  *Bright*, 443 F.3d at 282 ("It is misuse of state authority, rather than a failure to use it, that can violate the Due Process Clause.").

The activities of Savoy that Plaintiff contends are affirmative acts simply are not, in the context of the fourth element.  Failing to properly investigate Linda Weston is not an affirmative act.  Failing to properly monitor SCOH services provided by IFS is not an affirmative act.  And failing to follow-up on Linda Weston's criminal history in accord with the December 2003 state court directive, is not an affirmative act.  These failures to act do not constitute an affirmative misuse of state authority.  Furthermore, the link between representations made by Savoy to the state family court, that Linda Weston wished Beatrice to live with her and that Beatrice was safe, and the harm suffered do not justify the imposition of liability under the Due Process Clause of the Constitution.  Pennsylvania law requires that the family court, acting in the best interests of

the child, make its own independent finding that an individual is qualified to be deemed a legal custodian of a child—a finding that the state court made here. *In re Lowry*, 484 A.2d 383, 387 (Pa. 1984) (stating that an individual must "be found *by the court* to be qualified to receive and care for the child.'") (emphasis in original) (internal quotation marks omitted).[9] It is also significant that no objection was voiced by Vicky Weston, Beatrice's mother, to the proposed custodial arrangement, notwithstanding the fact that Vicky Weston was fully aware of Linda Weston's past. (Undisputed Material Facts ¶ 9.) In addition, there is nothing in the record to suggest that Savoy's representations to the court that Beatrice was safe were inaccurate. The IFS records support this representation.

This is not a case where Savoy's conduct, alone, affirmatively placed Beatrice in a position of danger that she would not otherwise have been in. Savoy played no part in the dependency proceedings being initiated. Moreover, it is tenuous at best to suggest that her representation to the court that the family preferred the custodial arrangement, at the initial dependency hearing, constituted the "but for" cause of Beatrice being placed with Linda Weston. In addition, Savoy's subsequent failures—to investigate Linda Weston, oversee SCOH services, and follow-up on the December 2003 court order—cannot be said to have affirmatively created the danger to Beatrice. Accordingly, a constitutional violation cannot lie here. The record does not support an affirmative act on the part of Savoy that was the but for cause of Beatrice's harm.

The cases are legion where a child was abused, a state social worker should have done more, but courts determined that those failures did not rise to the level of a due process violation. It is worth noting that the failures of Savoy in this case pale in comparison to the inactions of

---

[9] Pennsylvania law would not prevent a family court from awarding temporary legal custody of a child to an individual with an insidious criminal past, so long as the family court deems it to be in the best interests of the child. *In re J.P.*, 998 A.2d 984, 989 (Pa. Super. Ct. 2010).

other social workers who have neglected to do more in the face of actual abuse occurring.  For

example, in *DeShaney*, the state actors were plainly on notice of abuse occurring, failed to do

more, yet those failures were not determined to be constitutional violations.  *DeShaney*, 489 U.S.

at 201-02.  There are many other examples.  *See Sanford*, 456 F.3d at 311-12 (holding no

constitutional violation where high school received note from student indicating intent to commit

suicide, spoke to student about note, and student ended up committing suicide); *Bennett ex rel.*

*Irvine v. City of Phila.*, 499 F.3d 281, 289 (3d Cir. 2007) (holding no constitutional violation

despite DHS discharging supervision of certain siblings, and later failing to adequately

investigate claims of child abuse, where multiple children ended up abused and one murdered);

*Morrow*, 719 F.3d at 178-79 (holding no constitutional violation where schoolchildren

repeatedly bullied and abused by classmate, despite school knowing of abuse and acknowledging

to children's families it could not protect them); *S.S. v. McMullen*, 225 F.3d 960, 964 (8th Cir.

2000) (en banc) (holding no constitutional violation where state agency returned custody of child

to father who was known to allow child to have contact with known pedophile who ultimately

abused child); *Lewis v. Anderson*, 308 F.3d 768, 775-76 (7th Cir. 2002) (holding no

constitutional violation where foster children placed with adoptive family who did eventually

abuse children because state did not know or suspect the family to be child abusers,

notwithstanding knowledge of a single instance of prior abuse); *Forrester v. Bass*, 397 F.3d

1047, 1059 (8th Cir. 2005) (holding no constitutional violation where social workers failed to

comply with state requirements for investigating multiple hot line calls reporting abuse,

contacting law enforcement, and providing preventive and protective services with regard to four

children who were brutally abused and two eventually murdered); *Langdon v. Skelding*, 524 F.

App'x 172, 176 (6th Cir. 2013) (holding no constitutional violation where state agency

investigated multiple reports of abuse, found them to be unsubstantiated, and child eventually died after being chained to bed during house fire).

The cases of *Nicini v. Morra*, 212 F.3d 798 (3d Cir. 2000), and *Burton v. Richmond*, 370 F.3d 723 (8th Cir. 2004), provide interesting factual parallels as to why Savoy's failure to thoroughly investigate Linda Weston here does not amount to a constitutional violation.  In *Nicini*, a child was placed by a state agency in foster care.  212 F.3d at 801.  After trouble with other foster placements, the child ran to the Morra's home and requested that he be permitted to live there.  The agency investigator acquiesced.  *Id*. at 802.  The agency investigator interviewed the Morras at a home visit, was told that nothing would prevent them from being foster parents, and thereafter represented to the state family court that the Morras would qualify as foster parents.  *Id*. at 802-3.  Two weeks after the state court hearing, the investigator sent an application to the Morras requesting relevant background information.  The application was not returned by the Morras.  *Id*. at 804.  Four days later, the plaintiff fled the home claiming Mr. Morra provided him with drugs and alcohol and abused him.  *Id*.  A subsequent background check revealed that Mr. Morra was convicted sixteen years earlier for corrupting the morals of a minor and distributing controlled substances to a minor.  *Id*.  The District Court concluded that the record did not support a finding that the acts of the investigator constituted a deliberate indifference to the rights of Nicini, and judgment was entered for the defendants.  The Third Circuit affirmed.  *Id*. at 814-15.  Given the fact that Nicini wished to remain at the Morra home, the investigator's impression was that Nicini was doing well there (corroborated by a separate investigator and the state court), and given the fact that the only suspicion the Morra home was not appropriate was a complaint by Nicini's mother, the Third Circuit determined that "a jury could not permissibly conclude that [the] investigation was so inadequate as to manifest

deliberate indifference to Nicini's rights." *Id.* at 814.

In *Burton*, a plaintiff's mother left the plaintiff and her siblings with their aunt. 370 F.3d at 725. The aunt and the aunt's mother later agreed that four of the children would live with the aunt's mother. *Id.* To prevent the plaintiff's mother from returning and taking the children, the aunt and her mother contacted the state family agency to assist with obtaining a court order recognizing the custodial arrangement. *Id.* The court ordered the agreed upon custodial arrangement, but retained legal custody of the children. *Id.* Neither of the involved state case workers conducted a home study or criminal background check prior to the court's placement order. *Id.* at 726. The plaintiff's mother later returned to regain custody of her children and informed one of the agency case workers that her daughter was being abused. *Id.* One month later, the other case worker was informed that the mother appeared at a family barbeque making accusations that her daughter was being abused. *Id.* No action was taken by either case worker with regard to the allegations of abuse. *Id.* However, the children were later removed from the home after a subsequent hotline report of abuse. *Id.* The *Burton* court ruled that the failure to investigate the home prior to the court's placement, and the failure to follow-up on the reports of abuse, were not constitutional violations. *Id.* at 728-30. Specifically, the court ruled that there were no affirmative acts on the part of the state, and the failures to act by the case workers were not conscience shocking. *Id.* at 728-29.

It is a maxim of constitutional law that a state's failure to protect an individual against private violence does not constitute a violation of due process. *DeShaney*, 489 U.S. at 202. If we were dealing with a question of simple negligence, the result would be different. The social workers of DHS, which include Savoy, are placed in a position of trust in seeing to and ensuring the safety and best interests of children. The failure to properly carry out their responsibilities

may constitute negligence.  It does not constitute a violation of the Constitution.  "It would make no sense to open the federal courts to lawsuits where there has been no affirmative abuse of power."  *Ye v. United States*, 484 F.3d 634, 640 (3d Cir. 2007) (quoting *Parratt v. Taylor*, 451 U.S. 527, 549 (1981) (Powell, J., concurring in the result)).  The words of Chief Justice Rehnquist in *DeShaney* are worth repeating:

> Judges and lawyers, like other humans, are moved by natural sympathy in a case like this to find a way for Joshua and his mother to receive adequate compensation for the grievous harm inflicted upon them.  But before yielding to that impulse, it is well to remember once again that the harm was inflicted not by the State of Wisconsin, but by Joshua's father.  The most that can be said of the state functionaries in this case is that they stood by and did nothing when suspicious circumstances dictated a more active role for them.
>
> • • •
>
> The people of Wisconsin may well prefer a system of liability which would place upon the State and its officials the responsibility for failure to act in situations such as the present one.  They may create such a system, if they do not have it already, by changing the tort law of the State in accordance with the regular lawmaking process.  But they should not have it thrust upon them by this Court's expansion of the Due Process Clause of the Fourteenth Amendment.

*Id*. at 202-3.  Accordingly, we are compelled to conclude that the record here does not sustain liability under the state-created danger theory.  The City Defendants' Motion will be granted.

**B.     Immunity of Savoy**

The City Defendants argue that, in the event that the Court were to find that there was a constitutional violation, Savoy is nevertheless immune from suit.  We agree.  Under Third Circuit precedent, it appears that Savoy would be entitled to immunity from the time the dependency petition was filed until it was discharged on April 17, 2003.  In the Third Circuit, caseworkers, such as Savoy, are "absolutely immune from suit for all of their actions in preparing for and prosecuting such dependency proceedings."  *B.S. v. Somerset Cnty.*, 704 F.3d 250, 262 (3d Cir. 2013) (citing *Ernst v. Child & Youth Servs. of Chester Cnty.*, 108 F.3d 486 (3d

Cir. 1997)).  Recommendations made to the court in dependency proceedings fall within the blanket of immunity.  This immunity does not apply to "investigative or administrative actions taken outside the context of a judicial proceeding."  *Id.* (citing *Ernst*, 108 F.3d at 497 n.7).

While the Court of Appeals has not clearly defined when situations fall within these categories, in *B.S.* the court expanded the immunity granted in *Ernst* and has held that a social worker's investigative activities performed during, and for purposes of, on-going court dependency proceedings constitute "preparing for and prosecuting…dependency proceedings" and thus are entitled to absolute immunity.  *Id.* at 270.  In discussing the rationale behind immunity for a social worker, the court noted that unconstitutional acts of the social worker are guarded against by the state court, acting in the best interests of the child, acting as a safeguard against the quality of the work of the social worker.  In this case, Savoy would be entitled to immunity from the time that the dependency petition was filed through April 17, 2003, because all of her actions were performed for purposes of the on-going dependency proceedings.

### C.       Liability of the City of Philadelphia

Since Plaintiff has failed to establish a constitutional violation, the claim of municipal liability against the City of Philadelphia must also be dismissed.  The Supreme Court has determined that a finding of a constitutional violation is a prerequisite to finding municipal liability.  *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986); *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 (1989); *Grazier ex rel. White v. City of Phila.*, 328 F.3d 120, 124 (3d Cir. 2003); *Mulholland v. Gov't Cnty. of Berks, Pa.*, 706 F.3d 227, 238 n.15 (3d Cir. 2013) ("It is well-settled that, if there is no violation in the first place, there can be no derivative municipal claim").  Therefore, the Motion of the City Defendants will be granted on the claim of municipal liability.

In any event, the record does not support a claim of municipal liability under *Monell*.
Plaintiff contends that DHS's failure to have a policy requiring criminal background and
ChildLine checks for temporary legal custody placements, and the failure to train employees in
the performance of ChildLine checks, caused the constitutional violation.  We noted that DHS
policies and training are in accord with Pennsylvania state policies and training on these topics.
However, Plaintiff attempts to counter these arguments in responding to the City Defendants'
Motion as to Savoy.  Plaintiff relies upon the deposition testimony of Savoy's supervisor to
contend that it was DHS policy to perform criminal background and ChildLine checks in this
instance.  (Pl.'s Resp. 19-21.)  Even considering this testimony, there is nothing in the record to
suggest that Savoy was anything more than an underperforming outlier.  This does not, in itself,
amount to a constitutional violation.  *Harris*, 489 U.S. at 390-91.

The record here falls short of establishing that the failure to train Savoy was the driving
force behind the alleged harm.  *Grazier*, 328 F.3d at 124-25.  Moreover, the record does not
substantiate claims that through deliberate conduct, DHS "policy" or "custom" was the driving
force behind the harm.  *Board of Cnty. Com'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397,
404 (1997).  "A showing of simple or even heightened negligence will not suffice," and an
"inadequate training" claim applies only in "limited circumstances."  *Id*. at 407; *Brown v.
Muhlenberg Twp*., 269 F.3d 205, 215 (3d Cir. 2001) ("The scope of failure to train liability is a
narrow one.").  Accordingly, the City Defendants' Motion will be granted as to the claim of
municipal liability.

**IV.     CONCLUSION**

Under the prevailing law, the failures of Savoy and others to have done more to protect Beatrice Weston do not constitute a deprivation of substantive due process rights under the Fourteenth Amendment.  Accordingly, the City Defendants' Motion will be granted.

An appropriate Order follows.


**BY THE COURT:**


_____
**R. BARCLAY SURRICK, J.**